**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

SUZANNE SWINEHART, As Parent of
E.S., A Minor,

        Plaintiff

v.                                    Case No.  1:23-cv-00106

WARSAW COMMUNITY                **JURY TRIAL REQUESTED**
SCHOOL DISTRICT, NORTH CENTRAL INDIANA
SPECIAL EDUCATION COOPERATIVE,
AMY HOBBS, In Her Individual Capacity,
STEVEN FERBER, In His Individual Capacity,
MELISSA REES, In Her Individual Capacity,
KRISTIN TRIMBLE, In Her Individual
Capacity, DANIELLE WHITLOCK, In Her
Individual Capacity, ZACHARY HILL, In
His Individual Capacity, SHELBY MARSHALL,
In Her Individual Capacity, RILEIGH WOLPERT,
In Her Individual Capacity, DEFENDANT HOLLAND, In Her
Individual Capacity and DEFENDANT ROBERTS,
In Her Individual Capacity,

        Defendants.

<u>**COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

    Plaintiff, Suzanne Swinehart ("Suzi"), by counsel and as parent of E.S., a minor, for her

Complaint against Defendants, alleges:

**I.        <u>PARTIES</u>**

<u>Plaintiff</u>

1. Plaintiff E.S. is twelve (12) years old and the biological son of Plaintiff Suzanne

    Swinehart ("Parent" or "Mother"). He has been diagnosed with autism spectrum disorder,

    sensory processing disorder, emotional dysregulation syndrome, Tourette Syndrome and

epilepsy. Because of these conditions, E.S. is a "qualified individual with a disability" within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 705(20) (Section 504) and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104. He is eligible for special education and related services at school under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq.

<u>Defendants</u>

2. Defendant Warsaw Community Schools (the "District") is an Indiana public school corporation which receives federal financial assistance and is a public entity as defined by the ADA. 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104. The governing body of the District is the Board of School Trustees of the Warsaw Community Schools (the "Board"). As such, the Board is responsible for the supervision of the District and the management and control of all facilities, programs and employees of the District. Unless otherwise noted, the District and the Board will be referred to interchangeably herein as the District. The District is responsible for the operation of District schools, development of policies and procedures for District schools, the training and supervision of all faculty and staff employed by the District and compliance with federal and Indiana laws and regulations.

After relocating from Fort Wayne, E.S. enrolled in the District in August 2021. At all relevant times, E.S. attended public schools owned, operated, maintained, controlled, staffed and funded by the District, which had knowledge of his disability and is responsible for providing him with full and equal access to programs and activities operated by the District.

3. Defendant North Central Indiana Special Education Cooperative ("North Central")
   provides certain staff, services, funding or other resources for students with disabilities
   eligible for special education and related services enrolled in member school districts.
   Upon information and belief, North Central's relationship with the District is that of a
   joint services program as defined in IC § 20-26-10-1 or an interlocal agreement under IC
   § 36-1-7 et seq. In any event, at all relevant times the District belonged to the North
   Central co-op.

4. At all times relevant, Defendant Amy Hobbs ("Hobbs") was employed by the District or
   North Central as the Director of Special Services. As such, she has final decision-making
   authority for the District and/or North Central and was responsible for the supervision
   and training of staff under her direction and control. She was also responsible for
   ensuring the District or North Central's compliance with applicable federal and state laws
   and regulations. Hobbs had knowledge of the District or North Central's employees'
   seclusion practices and ratified their conduct.

5. At all times relevant, Defendant Steven Ferber ("Ferber") was employed by the District
   as an administrator with supervisory authority over certain District employees and
   programs at Claypool Elementary School ("Claypool"), which is owned, operated,
   maintained, staffed and funded by the District. Upon information and belief, Ferber's title
   was Director of the District's Gateway Education Center and/or a Principal for the
   District. Either way, he was a building-level administrator at Claypool. As such, he had
   final decision-making authority over matters involving students and staff in the emotional
   disabilities program at Claypool and was responsible for the supervision and training of
   staff under his direction and control. Upon information and belief, the District delegated

to Ferber the authority to make policy decisions regarding the use of seclusion on students attending Claypool, which decisions were ratified by the District.

6. At all times relevant, Defendant Melissa Rees ("Rees") was employed by the District as Principal at Claypool. As such, she was the District's highest ranking building-level administrator with final decision-making authority over matters involving students and staff at Claypool and was responsible for the supervision and training of staff under her direction and control. Upon information and belief, the District delegated to Rees the authority to make policy decisions regarding the use of seclusion on students attending Claypool, which decisions were ratified by the District.

7. At all times relevant, Defendant Kristin Trimble ("Trimble" or "Wuthrich"[1]) was employed by the District as a special education teacher at Claypool.

8. At all times relevant, Defendant Danielle Whitlock ("Whitlock") was employed by the District.

9. At all times relevant, Defendant Rileigh Wolpert ("Wolpert") was employed by the District as a behavior case manager.

10. At all times relevant, Defendant Shelby Marshall ("Marshall") was employed by the District.

11. At all times relevant, Defendant Zachary Hill ("Hill") was employed by the District as a behavior support liaison.

12. At all times relevant, Defendant Holland ("Holland") was employed by the District as an instructional assistant.

13. At all times relevant, Defendant Roberts ("Roberts") was employed by the District.

---

[1] Her maiden name.

14. Hobbs, Ferber, Rees, Trimble (f/k/a Wuthrich), Whitlock, Wolpert, Marshall, Hill, Holland and Roberts shall be referred to collectively as the "Individual Defendants." At all times relevant, the Individual Defendants acted under color of law in the course and scope of their employment for the District or North Central, as the case may be. The acts and omissions of the Individual Defendants were undertaken pursuant to a policy, custom or practice of the District, including a policy of inaction.

## II.    JURISDICTION AND VENUE

15. This Court has jurisdiction over Plaintiff's claims arising under the Constitution or laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983. Venue is in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendants maintain their principal offices in Kosciusko County, Indiana.

## III.    ALLEGATIONS COMMON TO ALL COUNTS

16. E.S. is a very active and social boy who loves being with his peers, has a wonderful sense of humor, likes telling jokes and making people laugh. He enjoys reading, music, playing video games, swimming and riding his bike. Although he qualifies for special education and related services at school, he is extremely bright, loves to learn and used to look forward to going to school each day.

17. As a result of his conditions, E.S. has difficulty regulating his emotions, which can lead to episodes of acute anxiety and sometimes needs time to de-escalate. He has sensory processing difficulty and does not like loud, chaotic environments (which overstimulate him), does not like being touched or when people invade his personal space. Any of these can trigger an outburst, and when he becomes very agitated, he sometimes engages in aggressive (hitting, kicking or pushing the wall or door, throwing items, yelling, crying)

and self-harming behaviors (hitting or biting himself) which can be triggered by difficult tasks, changes in routine or over-stimulation.

18. Because of his disability, sometimes when E.S. gets frustrated or upset he displays these behaviors at school. Instead of using prevention, re-directing him or using generally accepted de-escalation techniques or positive reinforcement interventions and support, District employees (including but not limited to the Individual Defendants) frequently dealt with his behaviors by confining him in a room or space, i.e., placing him in seclusion[2] at school. They did so excessively—even gratuitously—over a period of approximately one year beginning in February 2022.

### State and Federal Standards for Seclusion

19. Indiana is one of several states which permit the seclusion of students at school. Like most states, Indiana has established strict guidelines for doing so. In order to protect students, Indiana has adopted a detailed statutory and regulatory framework governing the use of seclusion and physical restraint of students in schools. See IC § 20-20-40 et seq. and 513 IAC 1-0.5-1 et seq. These provisions narrowly limit the circumstances when seclusion and restraint may be utilized by school staff and set forth certain requirements for training staff, documentation and reporting of incidents involving the restraint or seclusion of a student. Among other things, Indiana law provides that seclusion "shall not be used…except…as a last resort…where the student's behavior poses imminent risk of injury to self or others…." Once a student is secluded, seclusion "may only be used for a

---

[2] As used herein, the term "seclusion" is not limited to its definition under Indiana law but means any restriction on freedom of movement, including those which constitute a seizure for purposes of the Fourth Amendment or false imprisonment or confinement under Indiana law.

short period of time" and "shall be discontinued as soon as the imminent risk of
injury…has dissipated."

20. Because of the risks and potential for abuse of restraint and seclusion in schools, federal
authorities have also weighed in on this subject. In 2012, the U.S. Department of
Education (DOE) issued a Resource Document regarding the use of restraint and
seclusion in public schools. See https://www2.ed.gov/policy/seclusion/restraints-and-
seclusion-resources.pdf.

21. DOE recommends that "school districts never use physical restraint or seclusion for
disciplinary purposes, and that trained school officials should use physical restraint or
seclusion only if a child's behavior poses imminent danger of serious physical harm to
self or others."

22. Data collected by DOE's Office for Civil Rights (OCR) suggest that students with
disabilities are disproportionately subject to restraint and seclusion compared to their
nondisabled peers. Even though 12% of all children enrolled in public schools nationwide
have disabilities, they account for 67% of the students subjected to restraint or seclusion
at school. *Dear Colleague Letter: Restraint and Seclusion of Students with Disabilities* at
2 (December 28, 2016). And although many school districts use terms like "time out" or
"quiet area," OCR defines seclusion as "confining a student alone in a room or area that
he or she is not permitted to leave" and recognizes that seclusion may be deemed to have
occurred "regardless of what name the school uses to call the space in which the student
is secluded" and that "there is sometimes no difference between what occurs in a
'seclusion room,' a 'calm down room' or 'reset room.'" *Id.* at 19. OCR's *Dear
Colleague Letter* illustrates when the improper use of restraint or seclusion by school

districts may constitute unlawful disability-based discrimination or harassment. *Id.* at 13-16.

23. In October 2020, OCR published another civil rights data collection report titled *The Use of Restraint and Seclusion on Children with Disabilities in K-12 Schools*. According to that report, data collected by OCR from school districts across the country for the 2017-2018 school year reflect that 77% of the students who were subjected to seclusion were children with disabilities.

**The District's Written Policy on Seclusion and Restraint**

24. At all relevant times, the District had in effect a written policy (5630.01) titled "Use of Seclusion and Restraint with Students," which generally parallels Indiana law on the subject, including the requirement that school staff must "use prevention, positive behavior intervention and support, and conflict de-escalation to eliminate or minimize the need for the use of seclusion or restraint with students."  By its terms, the District's "policy applies to all students, regardless of the existence of a disability." The policy includes training, reporting and recordkeeping requirements. It expressly provides that "seclusion and restraint shall be used only (1) as a last resort safety procedure employed after another, less restrictive procedure has been implemented without success; and (2) when there is an imminent risk of injury to the student [or others]. Seclusion and restraint shall be used only for a short period of time or until the imminent risk of injury has passed." Under the District's policy, "seclusion and restraint shall not be used as a means of punishment or discipline, coercion or retaliation, or as a matter of convenience."

25. In this case, school records reveal that District personnel, including but not limited to the Individual Defendants, blatantly disregarded federal and Indiana law and the District's

own written policy, frequently placing E.S. in seclusion for minor infractions, even when his behavior did not pose an imminent danger of physical harm to him or others. In fact, District employees, including the Individual Defendants, were routinely placing him in seclusion on the flimsiest pretext (e.g., because he was "yelling," "leaving his designated area," "instigating others," throwing a beanbag at people, being "escalated," "disrupting the class," "throwing paper wads at board"), presumably out of frustration or as a form of punishment. He was often kept in seclusion well after any perceived danger of harm had passed, ostensibly to allow him to "process" his behavior before being released.

**The District's Custom or Practice of Seclusion as Applied to E.S.**

26. After relocating from the Fort Wayne area, E.S. enrolled in the District in the fall of 2021. From August of 2021 until February of 2022, he attended Eisenhower Elementary School, which is owned, operated and controlled by the District. His first teacher was wonderful: dedicated, patient, loving and compassionate. E.S. loved going to school and did well at Eisenhower for the first couple of months he went to school there. That all changed around October/November of 2021, when his terrific teacher quit. Instead of replacing her or hiring a qualified substitute, the District assigned an Instructional Assistant or paraprofessional to serve as his teacher. Upon information and belief, she was not a licensed teacher, nor was she properly trained to work with students like E.S., whose behavior worsened significantly soon after she assumed her new role. In the space of approximately one month, District employees called Mother between 20-25 times asking her to come pick up E.S. from school early and take him home.

27. In addition to the frequent involuntary early pickups, the District suspended E.S. multiple times in the fall of 2021 until District employees finally told Mother, "We propose E.S.

attending school half days" and District administrators eventually made the decision to change his placement from Eisenhower to Claypool: "In order to reduce suspensions and increase behavioral instruction, E.S. will participate in the behavioral program located at Claypool Elementary," supposedly in an attempt "to increase time in school while reducing the number of suspensions." In fact, it would later become apparent that District personnel were merely using this placement as a ruse to keep E.S. "in school" but out of the classroom.

28. E.S. finished the 2021 fall semester at Eisenhower, where he attended school until 2/25/22, when he started attending 5th grade in the District's WIN program for students with emotional disabilities at Claypool Elementary School. The WIN classroom is a loud and chaotic environment, which is a source of considerable anxiety for E.S. Almost immediately after E.S. began attending school at Claypool, District employees started placing him in seclusion for various behaviors related to his disability, many of which were simply disruptive or posed merely the *potential* risk of harm to himself or others. In hindsight, it became apparent that the District's plan to "reduce suspensions" of E.S. and "increase [his] time in school" was to send E.S. to Claypool and forcibly isolate him in a room by himself instead of sending him home. School records reflect that by doing so, District employees often made his behaviors far worse than whatever led to seclusion in the first place. In fact, in many instances school staff and the Individual Defendants secluded E.S. for being "disruptive," triggering a response to seclusion like that of a caged animal: hyperventilating, kicking the door, pounding on walls, screaming to be let out, crying and self-harming. School records reflect that many of E.S.'s most intense

meltdowns and physically aggressive behaviors started or escalated when he was being taken to the seclusion room or while he was being confined there.

29. Upon information and belief, the District has, or at all times relevant had, a custom, policy or practice of placing students with disabilities in seclusion—or what District employees call the "calming room," which is just an innocuous-sounding euphemism for seclusion. Whenever they did so, school personnel were supposed to utilize a form titled "Seclusion and Restraint Reporting Form" and provide parents with a copy as required by Indiana law. The form contains the name and address of Defendant North Central Indiana Special Education Cooperative, which developed, adopted, approved or ratified the District's custom, policy or practice of placing students with disabilities in seclusion.

30. Upon information and belief, the District maintains more than one "calming room" at various locations in the Claypool building which are used for the seclusion of students.

31. Upon information and belief, the Individual Defendants were not documenting all of the instances when E.S. was physically restrained or secluded, were not documenting them accurately or were not providing Mother with a copy of the form[3] for every seclusion which occurred as required by Indiana law and the District's own written policy. Therefore, the allegations herein are based only on those incidents which were documented and reported to Mother.

32. Within three days of starting at Claypool in February of 2022, the Individual Defendants began placing E.S. in seclusion on a regular basis. School records reflect that on some occasions E.S. went to the seclusion room on his own; however, when he did so and attempted to leave, District employees would not let him out of the room and held the

---

[3] Ferber claims that he was sending them home via regular U.S. mail; it is unclear why he did not email them to her.

door shut or locked it to prevent him from leaving. Upon information and belief, on some occasions E.S. simply did not leave a seclusion room or area because he was either told that he could not leave ("don't open the door," "don't come out" or "don't cross the line") or he knew that he was not allowed to leave.

33. A seclusion incident reporting form reflects that on 2/28/22, E.S. "was frustrated during the school lunch block that he did not pack his lunch and that the school lunch is not good. At this time he took a break in the calming room. While in the calming room he began to throw the chair and desk that was [sic] in there, initiating the seclusion." This statement suggests that District staff did not count his first few minutes in the calming room as a "seclusion" until after he started throwing furniture. Wuthrich, Marshall and Whitlock placed E.S. in seclusion for seven minutes because he was "exiting a controlled space while still visibly escalated." While in seclusion, he "began to hyperventilate, hitting himself, repeating 'let me out.'" The North Central seclusion form documenting the incident is signed by Ferber and Hobbs.

34. The same three Individual Defendants who had secluded E.S. on the 28th did so again two days later (on 3/2/22) for 42 minutes for the same stated reason: "exiting a controlled space while still visibly escalated" and E.S. "tried to leave the calming room while visibly escalated which initiated the seclusion." District staff closed the door. During seclusion, he was "yelling, hitting himself, kicking at the door and walls." Once again, Ferber and Hobbs signed the seclusion reporting form.

35. The next day (3/3/22), Wuthrich, Wolpert and Whitlock placed E.S. in seclusion for 17 minutes because he was "crawling around on the floor…moving around the classroom" and "making noise." The report does not explain how doing so posed an imminent risk of

injury. Once there, "he continued to try and leave the calming room while visibly escalated so the door was closed." There is no mention of him throwing objects in the narrative section of the form, but an entry in the form states that seclusion was necessary because he "escalates and begins to have unsafe behaviors such as throwing objects." A description of his behavior during seclusion states that E.S. (who has epilepsy) was "banging [his] head on wall, hitting head with his hands, hyperventilating, yelling, [in the] fetal position, constant movement." No District employees intervened to prevent E.S. from hurting himself.

36. Another entry on the form reads "Staff noted that when E.S. calmed down it looked as though he had an absent seizure;" however, no one employed by the District informed Mother or the school nurse. No one rendered first aid. The form is signed by Ferber and Hobbs.

37. A few days after that incident, on 3/8/22 Wuthrich, Wolpert, Whitlock and Roberts put E.S. in seclusion on two separate occasions because "he was using his fingers to whistle" in class, quieted down, then "began to make noise to instigate another student."

38. One can only imagine the terror, claustrophobia and panic which E.S. must have felt when he was trapped in the "calming room," but the observations documented by District employees give one some idea: during seclusion, his behavior was described as "banging head on wall, hitting head with his hands, hyperventilating, yelling, fetal position, constant movement, yelling, instigating other students."

39. Once again, no one intervened to prevent E.S. from injuring himself. Wuthrich sent Mother an email informing her that E.S. "was secluded twice today. Once this morning…due to instigating peers and stating he wants to go home and this afternoon for

13

instigating peers again." The incident form states that he was secluded for 58 minutes, but that evening Mother sent Wuthrich an email asking, "how long was he locked in the seclusion room?" Wuthrich responded with an email advising that E.S. had been secluded for 16 minutes that morning and 52 minutes in the afternoon. His daily behavior sheet for 3/8/22 bears the initials "C.R." (presumably denoting "calming room") for the morning meeting timeslot and afternoon math block.[4]

40. On 3/23/22, Wuthrich and Holland secluded E.S. for three minutes because he was visibly upset ("kicking his desk, grunting, head down") over taking his NWEA[5] test, then once he was in seclusion, he was "hyperventilating, yelling, pacing" in the "calming room." According to the narrative in the form, "staff closed the door initiating the seclusion" and he was described as "hyperventilating, yelling, constant movement" during the seclusion. The form is signed by Ferber and Hobbs; however, his daily behavior sheet for 3/23/22 reflects that he had earned three points (on a scale of 0-3, meaning "safe") every period of the day.

41. Wuthrich sent Mother an email informing her that E.S. "was secluded for 3 minutes this morning due to trying to leave the calming room while visibly escalated;" however, her email makes it clear that he was already in seclusion before the "3 minutes" started: "He was in the calming room taking a break due to being frustrated…[when he started] hyperventilating, yelling, and pacing which resulted in staff having to close the door."

42. At the top of the daily behavior form (or "points" sheet) utilized by the District, it says "Today I will" followed by a blank space for school staff to write the student's goal for

---

[4] Academic blocks last between 30-45 minutes.
[5] Northwest Evaluation Association, a nationwide standardized assessment for students.

that day. On the sheet dated 3/31/22, it says "Today I will <u>use the calming room when</u> <u>upset</u>."



43. His daily behavior sheet dated 4/11/22 contains a handwritten notation "calming room" during reading block. No other details are provided, and Mother was not provided with a seclusion incident report for that day. However, his daily behavior sheet has scores of 3 denoting that E.S. was safe, respectful, remained in the area and used coping skills during reading block.

44. His daily behavior sheet dated 4/15/22 has a handwritten note that "he spent some time in the calming room," but District employees did not provide Mother with a seclusion incident report form for either of these incidents, so the duration of these seclusions is unknown.

45. On 4/19/22, Wolpert, Whitlock and Roberts physically restrained E.S. for two minutes, then secluded him for six minutes for yelling, kicking his desk and throwing chairs. Notes in several of the seclusion reports suggest that District employees did not consider E.S. secluded when he was in the "calming room" as long as the door was open. Using their logic, E.S. could spend the entire day in the "calming room," but if the door were closed for two minutes, the seclusion only lasted for two minutes. For example, according to the narrative in the form dated 4/19/22, "A few seclusions occurred when E.S. re-escalated in the calming room and began to kick the walls. When E.S. was not secluded, the door was

opened." His behavior in seclusion is described as "screaming, hyperventilating, kicking."

46. On 4/28/22, Wuthrich, Wolpert and Whitlock secluded E.S. again, this time for 32 minutes. Apparently either while E.S. was riding the bus or upon his arrival at school, they had been advised that E.S. had unbuckled his harness on the bus and was kicking the seats and trying to leave his seat while the bus was in motion. After he arrived and went to the classroom, "he began to scream at other students to shut up" and was "asked to take a break in the calming room." He "went to the calming room and staff did not stand by the closed door," then staff complied with his request to open the door slightly (leaving it ajar or "cracked" open).

47. Sometimes E.S. would try to get out of the seclusion room, and District employees would tell him to stay inside or hold the door shut to prevent his escape. For example, an entry in the 4/28/22 report states that when he began pushing on the door, "staff had to hold the door closed until [he] was calm enough to process." An entry in the form under "Description of risk of injury which resulted in seclusion or restraint" states that E.S. "was kicking and unbuckling his seatbelt on the bus. He came into the classroom and continued to escalate. When [he] escalates, he begins to have unsafe behaviors such as throwing objects."[6] His behavior during seclusion is described as "pushing on the door, whistling, making noises, talking with staff."

48. The daily behavior sheet for 4/28/22 reflects that E.S. was in the "C.R." (presumably "calming room") for both his morning meeting and social skills periods. In the notes

---

[6] There is no indication that he did so on this occasion.

section of the sheet, it states that "He took a break in CR w/ staff encouragement" and was in "seclusion for a few mins but staff stayed by door a total of 30 [minutes]."

49. On 5/2/22, Wolpert, Whitlock and Roberts "initiated a seclusion due to the door being kicked open." According to their report, the "risk of injury" warranting seclusion was that E.S. was "attempting to leave the calming room while visibly escalated." He was in seclusion for 17 minutes. Ferber signed the form documenting the incident which, according to the daily behavior sheet for 5/2/22, reflects that E.S. was "asleep" during specials and writing. Upon information and belief, he fell asleep in seclusion.

50. The sheet also has a notation "sec" between his math block and the end of the day, implying he was in seclusion for the duration of that time.

51. On 5/6/22, Wolpert and Wuthrich secluded E.S. for 50 minutes for "kicking his desk, throwing the items in his desk, calling out student names, and…shouting at other students to shut up." According to the incident report, he was given a choice "to be quiet at his seat or take a break in the calming room. He continued to shout at other students. Staff escorted him to the calming room to take a break."

52. Once again, the form reflects that the "risk of injury" which supposedly warranted seclusion was E.S. "attempting to leave the calming room while visibly escalated." His behavior during seclusion is described as "yelling at other students to shut up, kicking the door, hitting the door with the chair." Ferber signed the form for the 5/6/22 incident, but dated his signature 5/2/22. Hobbs signed and dated the form 5/24/22.

53. On 5/10/22, Whitlock, Wuthrich and Marshall secluded E.S. on three separate occasions that day for a total of at least 76 minutes, first for "yelling at staff that he wanted to go home, screaming, knocking over chairs, throwing beanbags, kicking the yoga ball,

making threats to break items, squeaking [a] dog toy, ma[king] instigating comments at peers, and climbing on cabinets" then "walking in and out of the classroom." A second seclusion was prompted by him "climbing on the windowsill, walking on the table, wandering around the classroom," then a third seclusion occurred because he was "entering other students' space and throwing fidgets across the room." The incident report form states that the "risk of injury" warranting seclusion was "attempting to leave the calming room while visibly escalated." His behavior during seclusion is described as "screaming, kicking the door, climbing on the desk, throwing squeeze ball into the ceiling, sticking coping sheet in the door." Ferber signed the incident report. Mother was not provided with a daily behavior sheet for that day.

54. Defendants may claim that several of the occasions when E.S. was kept in the "calming room," office or hallway were not "seclusions" because he was not "physically...prevented from leaving;" a door was either open or kept ajar ("cracked" open), although they implicitly acknowledge that a closed door constitutes seclusion, even if it is not locked.

55. However, the Individual Defendants had other ways to prevent E.S. from physically leaving the particular room or area where he was being confined at the time without placing any mechanical barrier or impediment to him doing so. One tactic they regularly employed was to post a staff person outside the room to monitor E.S. and verbally instruct him to close the door or telling him to stay in the room if he opened the door or attempted to leave the area.

56. Another example is reflected in an entry in the seclusion report dated 5/10/22, which states that after E.S. was in the "calming room," he was told that he "would need to stay

behind the line or the door would be closed." Upon information and belief, the "line" was a reference to a piece of tape or other marking on the floor used to identify the boundary which he was not allowed to cross.

57. About a week later (5/18/22), Marshall, Whitlock and Holland secluded E.S. for four minutes because he was "invading the space of other students and staff, instigating behavior" and "throwing kimochis[7] in the general direction of the student…." His behavior during seclusion is described as "Screaming that staff was torturing him and that he wanted to go home." Mother was not provided a daily behavior sheet for that day.

58. The next day (5/19/22), the same three individuals secluded E.S. again for 19 minutes. The report describes his behavior in seclusion as "hitting and kicking doors and walls, biting self on the hand, screaming." Once again, District staff did not physically intervene to prevent him from hurting himself. Mother was not provided with a daily behavior sheet for that day.

59. On 5/20/22, Mother received an email from Whitlock (sent from Wuthrich's email address) informing her that E.S. "had to be secluded on both Wednesday and Thursday. Wednesday's was for 4 minutes and Thursday's was for 19 minutes….Both seclusions were a result of [him] invading the space of other students and staff in the classroom. He walked himself to the calming room both times."

60. When E.S. started 6th grade at Claypool in August of 2022, District personnel continued their practice of regularly secluding him at school. On 8/23/22, Trimble sent the Mother an email (copying Rees and Ferber) stating that E.S. "became unsafe and was escorted to the calming room" where he remained until getting on the bus. Mother never received a

---

[7] A Kimochi is a soft, plush toy (or "plushy") used as a social-emotional learning tool to teach children to identify and express emotions. www.kimochis.com/au or www.doinglifetogether.com.au

seclusion incident report form for this seclusion, only a copy of his daily behavior sheet. Since Trimble did not provide Mother with a seclusion report documenting the beginning and end times for this seclusion, its duration can only be estimated. The behavior sheet contains a handwritten notation "teacher initiated break 30 min" then "containing to WIN 10 min," but no reference to the calming room.

61. The following day (8/24/22), Wuthrich sent Mother an email telling her that "as a consequence of yesterday's actions, E.S. was in the office for lunch and recess today." His daily behavior sheet for 8/24/22 reflects that he spent 75 minutes in the office (believed to be in seclusion) that day.

62. On 8/29/22, Rees and Marshall secluded E.S. for being "disrespectful, defiant, in others' areas and throwing paper at other students." According to them, his "attempts to leave designated area" and "yelling at staff" posed a "risk of injury" which warranted seclusion for 37 minutes. His behavior during seclusion is described as "throwing shoes at staff, hitting walls, screaming, speaking unkindly to staff, climbing the walls of the calming room,[8] biting self." District employees did not intervene to prevent E.S. from hurting himself, and self-inflicted bite marks on his hand are noted.

63. Trimble sent Mother an email the next day saying that "once in the office he refused to stay in a safe location so he was escorted to a calming room with the door open.[9] He began testing the boundaries of his area which began the seclusion [even though he was already in seclusion]. The seclusion lasted 37 minutes. Once he de-escalated he completed 1 classroom assignment and fell asleep."

---

[8] It is unclear how he accomplished this feat.
[9] Presumably Trimble did not consider that a seclusion.

64. The following week (9/8/22), Rees, Holland and Hill secluded E.S. for reasons which are unclear since no description of the events or risk of injury which precipitated seclusion is provided. Indeed, there is no information whatsoever suggesting that E.S. was doing anything which posed an imminent risk of injury; the form simply states that he "was escalated and began to run from staff after he agreed to walk to the calming room area. Two staff escorted E.S. into the calming room at 12:45 p.m." Once he was there, "staff…exited the calming room and closed the door. [He] calmed down within five minutes of being in the calming room. Staff brought lunch to [him] and made sure he had everything he needed to be successful. [He] chose to read a book as part of his de-escalation."

65. Although the form states that seclusion lasted for 20 minutes, Trimble sent Mother an email that afternoon suggesting that he had been kept in seclusion for three hours: E.S. had been "removed from Mrs. Gunder's class this morning for throwing paper at the whiteboard repeatedly. He worked in the upstairs resource calming room and did not make it back to class."

66. On E.S.'s daily behavior sheet for 9/8/22, his behavior leading to seclusion is described as "throwing paper wads at board" and the duration of his behavior is noted as four hours. That afternoon, Trimble sent Mother an email (copying Gunder and Rees) advising that E.S. had been "removed from Mrs. Gunder's class this morning for throwing paper at the whiteboard repeatedly. He worked in the upstairs resource room calming room [sic] and did not make it back to class."

67. It appears that there is a significant discrepancy between the information in the 9/8/22 seclusion report form and the daily behavior sheet, the latter of which contains some handwritten notes in the left margin. Some of those notes are cut off from the photographic copy provided to Mother ("t of sroom calming om 45-45"):



68. When read in conjunction with the seclusion report form and Trimble's email to Mother, the partially visible notes suggest that E.S. was in seclusion on that particular day for at least three hours (from 12:45 until 3:45 based on the reported start time of the seclusion and his dismissal time of 3:45)—not 20 minutes as stated in the seclusion incident report.

69. On 9/19/22, Holland, Rees, Marshall and Hill secluded E.S. on two occasions for "disrupting NWEA testing" and attempting to elope. The first seclusion lasted 110 minutes; the second lasted 126 minutes. The form reflects that the risk of injury resulting in seclusion was "elopement" and his behavior during seclusion is described as "singing unkind words to staff, kicking and hitting the walls, attempting to elope from the office, refusal to complete work, refusal to use a coping skill."

70. Two days later (9/21/22), the same four Individual Defendants secluded E.S. for 51 minutes after he ran upstairs and hid in the hallway. They justified doing so out of "staff

concern that [he] was going to jump from the top of the stairway to get away from staff."
During the seclusion, he was "ripping papers…kicking and hitting the calming room
door, screaming [and] crying."

71. That afternoon, Trimble emailed Mother (Ferber and Rees were copied) saying that
"while on break he eloped from staff resulting in an escort to the WIN calming room
where his seclusion began. It lasted 51 minutes. He was unwilling to process with staff
prior to getting on the bus…." His daily behavior sheet has a notation "secluded for 51
minutes" and reflects that seclusion was the only intervention used by school staff to
address this behavior.

72. The next day (9/22/22), Trimble, Hill and Holland kept E.S. in seclusion on three
different occasions. The first incident happened when he "began climbing on backpack
cubbies, pounding on the door, asking students by the bathroom to let him out [and]
swatting at the staff's face," prompting them to tell him "we will go to the calming room"
and when "staff closed the door. [He] immediately began hitting and kicking the door…"
This seclusion lasted 37 minutes.

73. The same Individual Defendants secluded E.S. a second time that day for "instigating
other students (pointing at them, laughing at them, calling their names)." That seclusion
lasted 25 minutes.

74. The third seclusion that day happened after E.S. grabbed a staff member's [identification]
badge, so "staff assisted [him] back to the calming room and closed the door. The door
was then closed due to elopement initiating the seclusion." This seclusion lasted for 55
minutes. According to the incident report, the "risk of injury" which supposedly
necessitated the seclusions was "bodily injury, preventing the ability for students and

staff to safely enter or leave the building, history of elopement;" however, in a section titled "Description of injuries to student, others, property" it states "none." His behavior during the seclusions is described as "hitting himself in the head with his hands…crying, screaming, hitting the walls." Once again, District employees did not intervene to prevent E.S. from injuring himself.

75. Ferber emailed Mother a report for the 9/22/22 seclusion, then on 10/25/22 (after she requested copies of all reports), he emailed her another version of the same report, adding new content which was not contained in the original report which he had sent her a month earlier.

76. On the afternoon of 9/22/22, Trimble sent Mother an email advising that E.S. "was removed from the classroom this morning prior to specials due to disrupting the class" and "swatting at staff." According to Trimble, the second seclusion happened when "he began instigating other students and disrupting the students working." Once in the "calming room" with the door open, he "began yelling out and in response staff closed the door lasting 25 minutes. When he was quiet, the staff opened the door [but] he stated he was not ready to complete the test and continued 'coping.' After 20 minutes [he] began leaving the calming room, climbing over staff and trying to take her badge. Staff assisted [him] back to the calming room where the door then remained closed for the remainder of the day (65 minutes)." Ferber and Rees are copied on the email. The daily behavior sheet for 9/22/22 bears a notation "secluded for 127 minutes;" no other interventions are noted.

77. Trimble, Marshall and Holland secluded E.S. again the next day (9/23/22). Their stated justification for doing so was that "Staff gave the directions that he will need to sit in his

seat or the calming room," telling him "If you leave your area, you will go to the calming

room." According to the report, "Approximately 2 minutes later [he] got up out of his

seat and began to leave his area. Staff directed [him] to go to the calming room….While

in the calming room with the door cracked, [he] played with a timer and wandered around

the room. He body slammed the door and climbed under a table next to the calming

room. Staff assisted [him] back into the calming room and closed the door initiating the

seclusion." The stated "risk of injury" necessitating seclusion is listed as "elopement."

For the description of injuries to student, others or property, it states "none." His behavior

during the seclusion is described as "threw stress ball, completed NWEA test." The

duration of this seclusion was 158 minutes.

78. That afternoon, Trimble emailed Mother advising her that E.S. had gotten upset and "was

banging on the doors and standing outside door 10," then "was directed to sit at his seat

or in a calming room….After about 15 minutes in the calming room…[he] slammed the

door to open it further and hid under a table outside the calming room. Staff assisted

[him] back into the calming room where the door was closed and will remain closed due

to his leaving his designated area. The door remained closed from 9:57 until 12:35. While

in the calming room, [he] was able to calm himself down within 20 minutes and remained

calm until lunch while completing his NWEA test and other classwork….After recess he

returned to the calming room (with the door open) and completed the rest of his work

with no issues." Ferber and Rees were copied on Trimble's email to Mother.

79. Three days later (9/26/22), the same three District employees secluded E.S. again because

"he yelled unkind things about the other students in this class. He began hitting his

lunchbox on his desk and yelling at staff," who "requested that [he] move to the calming

room because he was disrupting the learning of the other students in the room….Once in the calming room, staff requested that [he] use a coping skill. [He] asked for a ball to play with. After several times of throwing the ball out of his area, [he] attempted to elope the calming room. He was caught by staff and placed back into the calming room, beginning the seclusion." His behavior during the seclusion is described as "screaming, yelling, hitting himself, kicking the walls, sitting in a bean bag." No one attempted to physically stop E.S. from hurting himself.

80. "[He] fell asleep at 2:47 p.m. and woke up at 3:40 in time to get a drink and get on the bus." According to the report, this seclusion began at 2:22 p.m. and ended at 2:47 p.m. (25 minutes). Apparently, District employees did not count the 53 minutes that E.S. was sleeping in seclusion as seclusion time.

81. That same day, Trimble sent Mother an email (copying Ferber and Rees) advising that after lunch, E.S. "went to a calming room on his own….and eloped from the calming room. Staff assisted [him] back to the calming room where he attempted to elope a second time initiating staff to close the calming room door starting the seclusion. This lasted 20 minutes until [he] fell asleep. He woke up prior to bus dismissal, spoke to staff kindly, and got on the bus with no issues." There is no mention of the seclusion on the daily behavior sheet for 9/26/22.

82. Trimble, Holland and Marshall secluded E.S. again on 9/27/22. On the report, the narrative states that he had "ended his previous school day in a seclusion, resulting in him beginning his day in the WIN room instead of his Gen Ed class." According to the report, "he left his seat and attempted to elope the room. Staff prevented him from leaving the room and asked him to go to the calming room….[He] went on his own and asked for the

26

door to stay open. He then picked up the bean bag chair in the calming room and threw it at staff. Staff removed the bean bag and began the seclusion."

83. The stated "risk of injury" on the form is "elopement, throwing items at staff." His behavior in seclusion is described as "throwing items in the calming room, hitting, screaming, shouting unkind words to others, drew on self when supposed to be using a coping skill, ripping up papers and eating them." This seclusion lasted 195 minutes. The incident report bears Ferber's electronic signature, although it is dated 9/29/22.

84. That afternoon (9/27), Trimble sent Mother an email (copying Ferber and Rees) advising that E.S. "started his day in the WIN room due to ending his day in a seclusion….began to instigate WIN students, wander the classroom and push through staff standing in the WIN room door. Staff asked [him] to walk to the calming room on his own….Staff had the door open and [were] standing in the doorway. [He] attempted to hit staff with the bean bag initiating staff to close the door starting the seclusion. The seclusion lasted 3 hours due to [him] continuing to re-escalate when staff attempted to process with him." His daily behavior sheet for 9/27/22 bears a handwritten notation "Immediately escalated. Secluded for 195 minutes."

85. The next day (9/28/22), Holland and Marshall secluded E.S. for 109 minutes after he "ran to the cafeteria. He immediately attempted to grab a wet mop, but staff grabbed it from him. Staff began to escort to WIN. [He] attempted to trip and kick staff during transport. Once in the WIN calming room, he began to bite himself and scream and cry." Once again, District employees did not try to prevent E.S. from hurting himself.

86. The stated "risk of injury" which supposedly necessitated seclusion was "elopement," but the description of injuries section on the form reads "None." His behavior during

seclusion is described as "very combative during escort and the first five minutes of the seclusion. After that, [he] sat in a bean bag chair and spoke to staff but would not discuss what caused him to be upset. [He] continually yelled that he was ready to leave the calming room and go back to class, but would refuse to use his coping skills. He attempted to verbally instigate other students in the room." The report bears Ferber's digital signature.

87. That afternoon, Trimble sent Mother an email (copying Ferber and Rees) advising that E.S. had "eloped from staff which quickly escalated into an escort to the WIN calming room. Once in the WIN calming room his behavior continued to escalate initiating a seclusion. His escalated behavior once secluded ended shortly but the seclusion lasted the rest of the afternoon due to refusal to complete next steps (coping skill, process, last task)." His daily behavior sheet for 9/28/22 bears a handwritten note stating "secluded in WIN for 109 minutes. Ended his day in seclusion."

88. Marshall, Holland and Trimble physically restrained E.S., then secluded him again on 10/4/22 after he "made an instigating comment to another student" and "continued to mess around in class." Staff asked him to go the WIN room, where "he refused to go to his seat. He began swinging a beanbag around the classroom, so staff corralled him into the calming room. He tested his boundaries for three minutes by sticking his arms out of the door and continuing to swing the bean bag toward staff, beginning the seclusion."

89. The supposed "risk of injury" resulting in seclusion was described as "Swinging the bean bag around the classroom, near staff and other students."

90. On 10/4/22, Marshall, Holland and Trimble kept E.S. in seclusion for *six (6) hours*— from 9:48 a.m. until 3:45 p.m. During seclusion, he was "throwing the chair at the door,

swinging the bean bag chair at staff, screaming, yelling, using the desk as a drum, kicking

the door, removing screws from the door with a spork." That last behavior is believed to

be his attempt to dismantle the locking mechanism or latch on the door in an effort to

escape.

91. Exhausted, eventually E.S. fell asleep, but District staff kept in seclusion.

92. The seclusion report bears Ferber's electronic signature. For some reason, the daily

behavior sheet for 10/4/22 makes no reference to the seclusion, perhaps because E.S.

spent the entire day in seclusion.

93. That afternoon, Trimble emailed Mother advising that E.S. "was in ISS [in-school

suspension] and secluded for the entire day due to instigating remarks he made to a

student in Mrs. Gunder's class and escalating in the WIN room." Trimble did not explain

how this behavior posed an imminent risk of injury.

94. The next day (10/5/22), Holland, Trimble and Marshall once again secluded E.S. for

essentially the entire day (from 9:31 a.m. until 3:55 p.m., or a total of six hours and 24

minutes). During that time, District employees did not permit him to use the restroom.

According to the report, he "began his day in WIN due to ending his day in seclusion

yesterday." When he was given an assignment, he "crumpled up one of his pages and

threw it on the floor....then stabbed his water bottle with a pencil and began making a

mess at his desk. He then loudly began tapping his pencil on his desk, disrupting the

class. Staff asked [him] to move himself to the calming room so he could continue to

make noises." He went into the room, then "immediately attempted to leave again. Staff

stood in the doorway and [he] attempted to move his limbs out of the room. Staff

reminded [him] that attempting to leave his area will result in closing of the door. [He]

continued to try to move his limbs out of the room, resulting in the door being closed and beginning his seclusion."

95. The alleged "risk of injury" stated in the 10/5/22 report is "throwing objects in the classroom, disrupting the learning environment, elopement." Ferber affixed his electronic signature to the incident report.

96. At 9:41 a.m. on 10/5/22, Mother emailed Trimble (copying Ferber and Rees) stating that E.S. was "very worried about starting off the day in seclusion. If he is going to be locked in there for hours again please call me and I will pick him up." When she sent Trimble the email, Mother was unaware that E.S. had already been in seclusion since 9:31 a.m. that morning.

97. Mother specifically asked District employees to contact her by phone if E.S. was becoming dysregulated at school since she was unable to regularly check her email inbox while working. Despite her request, District personnel never even attempted to call her. Ferber sent Mother an email at 9:57 a.m. on 10/5/22 advising that E.S. "was not starting in the seclusion room" but that "he is now in the seclusion room due to class disruption. Upon entering the seclusion room, he was testing boundaries by placing feet and hands outside of the room. He was directed that if this persisted, then the door would be closed. He continued, so the door was closed. At the present time, he is yelling in the seclusion room."

98. That afternoon, Trimble emailed Mother (copying Ferber and Rees) to inform her that E.S. had been secluded because he "began to disrupt the class and was asked to take a break in the calming room. While in the calming room he began testing the calming room boundaries resulting in the door closing. As the door was closed his behavior increased

(pushing the door, crying, yelling, etc.) initiating a seclusion. His seclusion, like his behavior, continued until lunchtime. After eating he fell asleep and remained asleep until the end of the day."

99. His daily behavior sheet for 10/5/22 does not mention the seclusion and reflects that E.S. was "asleep" (apparently in seclusion) from lunch time until the end of the day.

100. Horrified at the amount of time that E.S. was being confined in a room, the next morning (10/6/22) Mother sent Trimble an email advising that E.S. "will not be coming today. He is screaming and crying not wanting to go and be locked up all day again. Starting off this way I am sure it will not be a good day and he is best to stay home."

101. Later that afternoon, Mother sent an email to Ferber (copying Trimble and Rees) asking "how is this ok to imprison a child in a seclusion room for 6 hours one day and 6.5 hours the next? We really have a serious issue here. In order for [him] to return to school I will need reassurance that he is not being mistreated and abused. I can't even express to you how upset I am. Do you know that he didn't even go to the restroom one time yesterday?!?! No one took the time to ask if he needed to go!" She closed by suggesting that Ferber "might want to read over the department of education guidelines for restraint and seclusion."

**Defendants' Attempts to Conceal their Illegal Seclusion Practices**

102. Miraculously—after Mother sent her emails to Ferber, Trimble and Rees on October 5th and 6th, 2022—she stopped receiving seclusion report forms from the District. The daily behavior sheet for 11/4/22 has several scores of zero and one with a handwritten notation "Running halls, jumping off of hallway walls," yet it contains no mention of E.S. being

placed in the "calming room" or seclusion for these behaviors, which in the past had

resulted in seclusion.

103. In the weeks before Mother called out Defendants, their own records reveal the appalling

extent of their isolation, confinement and psychological abuse of E.S. According to

school documents, between 9/19/22 and 10/5/22, District employees kept him in

seclusion for at least 27 hours and 17 minutes.

104. On at least one occasion, he could be heard screaming in the seclusion room.

105. Frequently, a District employee would hold the door shut to prevent E.S. from opening it

or sit in chair outside the door, guarding it to make sure he did not try to leave.

106. An entry in E.S.'s Individualized Education Program (IEP) developed by the District

states that from the beginning of school in August of 2022 until 9/7/22, "an overall

change in behavior has led to more removals from general education" and that "for 12

days during this timeframe (60%), once [he] has been removed from general education he

has been unable to return."

107. Notes in the IEP also state that Mother "has kept him home since October 4" and that

"Claypool/WIN staff shared that E.S. has not been in seclusion this year due to his

attention span," both of which are demonstrably false as documented in the District's

own records.

108. In the "Concerns of the Parent" section of the IEP, it states that Mother had expressed

"Concerns with the use of the seclusion room." Under "Behaviors of Concern," it states,

"Leaving designated area-wandering around the classroom," and "Disruptive behavior-

yelling, running around the classroom." In the IEP notes, it states that Trimble reported

that "we are not seeing physical aggression with other students, but he has been more physical with the adults."

109. In the Written Notes section of the IEP, it states that Mother "shared that she was upset and concerned about the overuse of the seclusion room. She shared that she didn't realize that he was being [kept] in the seclusion room as long as he was. She shared that on 10/4, [he] came home crying, rolled up in a ball. He said that he hated school and feels that the staff hates him."

110. An entry below that reads: "On 10/5/22, Mother emailed staff and asked that she be called if he has to go in the seclusion room. He was in the seclusion room from 9:31-3:45 on 10/5/22. On 10/4/22, he was in the room from 9:48-3:45. E.S. told her that no one asked [him] if he had to go to the bathroom." Mother told District employees that "putting E.S. in seclusion is a means of control" and "he screams and cries until he falls asleep."

111. The notes reflect that Mother pointed out that secluding E.S. triggers a "fight or flight response" and that he "can't calm down when he is locked in the seclusion room." She questioned the "imminent risk of injury" warranting seclusion, asked why the window to the seclusion room was covered and asked how much training school staff have had on the use of seclusion.

112. After Mother pointed out that when E.S. was placed in seclusion on 9/23/22 he had "calmed within 20 minutes and remained calm," another entry in the written notes of the IEP states that Tina Northern, an assistant director for the District, "said that if E.S. is calm, there is no reason for him to remain in the seclusion room." She also admitted that

"even a verbal threat is not a reason to go to seclusion" and that "once the risk to himself or others is over, then he should be allowed to leave seclusion."

113. An entry in the IEP notes section states that "The calming room in the WIN room can be used for multiple purposes. It can be used for a student to choose to take a break, or as a work space. It can also be used for seclusion if there is an imminent risk [of] danger to self or others."

114. Mother sent Ferber an email on 10/10/22 requesting a case conference that week and advising him "At this time, I do not feel safe sending E.S. to school as a result of the misuse of the seclusion room." She asked him for a copy of the District's seclusion and restraint plan and Ferber sent her a link to the policy.

115. At her wits' end, the next day (10/11/22), Mother sent an email to the District's Superintendent, David Hoffert, making him aware of the situation and requesting a meeting to discuss his staff's "inappropriate use of the seclusion room at Claypool Elementary School," advising him that "I no longer feel he is safe and being treated with dignity and respect" and that she was keeping E.S. home from school "until you can assure me that acceptable changes will be made to the use of seclusion and E.S. is safe to return." She cited several examples of how the District's use of seclusion violated Indiana law.

116. Instead of discussing Mother's concerns with her, Hoffert delegated responsibility for arranging a meeting to Hobbs, but he did not attend.

117. On 10/13/22, Mother sent an email to Rees, Hobbs, Ferber, Hoffert and Trimble expressing her disgust over their lack of communication or concern over the situation.

118. Not surprisingly, after months of being secluded by District staff, E.S. grew terrified of
     going to school and began showing signs of anxiety at the very mention of school. When
     Mother asked him about school, he told her that "they don't treat me good," "they don't
     like me," and that he was "being locked in a room," which makes him feel "stressful" and
     "panicky;" "When they lock the door, it feels like I'm trapped and can't do anything to
     get out."

119. After hearing that, Mother did not believe he was safe at school. She was reluctant to
     send him out of fear that he would be further traumatized by seclusions, so she kept him
     home from approximately 10/6/22 until 10/27/22, when she made the difficult decision to
     send him back to school with the support of his outside behavior specialist.

120. The next morning (10/28/22, a Friday), Mother walked E.S. to the end of their driveway
     to get him on the bus. When the door opened, instead of boarding the bus, he just stood
     there like a first-time parachute jumper in the door of an airplane: paralyzed with fear,
     visibly anxious and reluctant to leave. In an effort to coax him into boarding, Mother
     used verbal prompts while the driver waited, but E.S. refused to get on the bus. Not
     comfortable forcing him to go to school, she kept him home for the day. At 9:24 that
     morning, Mother sent Hobbs an email (copying Ferber, Rees and Trimble) advising "I
     was unable to get E.S. on the bus this morning. He took one step up on the steps and
     stopped and refused to get on….I couldn't make myself 'force' him on as it is very
     understandable why he is anxious."

121. Once Mother expressed her displeasure with Defendants' practice of placing E.S. in
     seclusion, they found other ways to keep him out of school. On 11/2/22, E.S. went to
     school at Claypool. Trimble sent the Mother a text message: "We are currently taking a

non-scheduled break. We were removed from class for making loud noises, tossing things and speaking out of turn."

122. On 11/11/22 (a Friday), Hill told E.S. that he was "talking too loudly" while walking to class so he was sent to a "break room" where he had a meltdown, then ran to the playground. Once he calmed down, he asked if he could go to class and was told that he would not be allowed to go to class the rest of the day, causing his behavior to escalate again.

123. Ferber sent Mother a text message advising that E.S.'s "morning has been very rough and [he] needs to be picked up ASAP." When Mother replied that she was working and unable to pick him up from school, Ferber shot back "Unfortunately, E.S. must be picked up. I am suspending him from school."

124. Mother later learned that Ferber had secluded E.S. by confining him to a hallway between the doors to the outside and a locked set of doors leading to the interior of the school building. While E.S. was secluded in this space, Ferber sat in front of the first set of doors and told E.S. that he would have to stay with him the rest of the day. Ferber kept E.S. secluded for at least an hour before Mother picked him up from school early (2:20 p.m.) to prevent him from being kept in seclusion any longer. Had she not done so, E.S. would have been kept in seclusion for over three hours.

125. On the Monday after the Friday incident (11/14/22), Ferber sent Mother a text message advising her that E.S. "will be in the WIN room all day for in-school suspension."

126. The next day (11/15/22), E.S. refused to go to school.

127. After Mother raised Hell about the District's abuse of E.S. in the fall of 2022, the District used different tactics to conceal its illegal seclusion practices. For example, District

employees became less transparent about the way they were treating E.S. at school; it became apparent that they were trying to be more careful by coming up with creative ways to describe or justify their seclusion of him. They called seclusions "breaks" and used terms like "sensory room" and "break room" instead of "seclusion" to describe the rooms where they isolated him from his classmates, when in reality they are the same thing. They also told Mother that E.S. was voluntarily choosing to be in these rooms by himself, instead of being forced to do so by school staff.

128. In late fall 2022, District personnel suddenly discontinued their practice of providing Mother copies of the seclusion report form which they had been using for months before she complained about the frequency and duration of seclusions.

129. Indiana law specifically excludes a "scheduled break, as described in a student's IEP and during which an adult is continuously present in the room with the student" from the definition of seclusion. After Mother sent her emails in October, the District held a case conference on 10/17/22 and developed an IEP for E.S. dated 11/3/22. Lo and behold, in the "Services and Other Provisions" section of that IEP, it provides for four "strategic breaks" per day "to break up long periods of sitting to allow for physical activity."

| Special Education Services | 10/17/2022 | 4 per day | 10 minute(s) | 10/16/2023 | General Education Setting | Behavioral Need |
|---|---|---|---|---|---|---|
| Narrative:<br>4 strategic breaks provided to break up long periods of sitting to allow for physical activity<br>Times can be altered as needed<br>(ex: 11:00 and 2:40) | | | | | | |

130. The 11/3/22 IEP developed by the District (after Mother's emails to school staff in October) uses the term "break" 50 times. In contrast, the IEP which the District developed before Mother's emails and dated 9/2/22 uses the word "break" about 20 times.

131. On or about 11/29/22, E.S. was in the general education classroom for math when the teacher asked him to take out his book. He refused, started crumpling papers and threw some on the floor. Because of his disability, E.S. does not like it when people touch him or get physically close to him; doing so upsets him and may trigger a "fight or flight" response.

132. School staff who work with E.S. know this, but Hill got up close to E.S. anyway and told him that he needed to take a break. Uncomfortable with Hill in his personal space, E.S. became more upset and tried to get away from him.

133. Rees sent Mother a typed "Notice of Student Suspension" dated 11/29/22 informing her that E.S. was being suspended from school for two days over the incident. In contrast to the typical letter which school administrators send parents of students who are being suspended, Rees gave a detailed, carefully worded chronology of events describing what had allegedly happened and noting the times.

134. According to Rees, Hill and Holland were telling E.S. to take a break before Holland left the classroom to see if the "break room" was unlocked. Hill, Holland and/or Trimble then took E.S. to the "break room," where he "closed the door leaving staff in the hallway. Staff unlocked the door to make sure he was OK." He asked to go back to class, but staff told him that he could not go back until he talked about why he got upset.

135. Forced to "process" what had happened, his behavior escalated and he ran into the hallway. Once he left the room, he ran around indoors then attempted to enter the office, but school staff refused to unlock the door, so he eloped from the building. He left school property, returned then left again. He ran around outside and into a wooded area behind the school.

136. School staff called 911 and the sheriff's department dispatched a unit to the area where E.S. had run away. The responding officer transported E.S. back to Claypool, where Rees had him placed "in a calming room in the office. Door was opened and he attempted to elope. Assisted back into calming room and door closed. Directed that if he is away from the door it will stay open. After kicking the door once he backed away from the door. Door is cracked [ajar]."

137. Mother was out of town for work on the day of this incident when she received a phone call from a secretary in the Claypool front office advising her that police had been called and instructing her to come pick up E.S. from school. When she arrived at school, she found E.S. in the office "calming room" with the door closed.

138. Prior to the incident on 11/29/22, E.S. had never eloped from school property. He would later tell Mother that he ran away because "they were probably going to lock me in that room again."

139. On 12/1/22, Ferber sent Mother an email: "I am checking in regarding E's attendance. The suspension ended yesterday, but he is not here today. Will he be attending tomorrow?"

140. After Mother expressed her displeasure with the recurrent and ongoing seclusions, District employees stopped communicating with her. Although she specifically asked Claypool staff to inform her whenever E.S. was separated from his peers, they failed to do so.

141. After Christmas break, District employees continued to remove E.S. from class and place him in what it calls a "break room" (believed to be an empty classroom) for engaging in various behaviors. They kept him there, isolated or segregated from his classmates (in

what amounts to *de facto* seclusion) and did not allow him to return until he "processed" why he was upset.

142. Near the end of the school day on January 27, 2023, E.S. was in the classroom not doing his work. After he tossed a piece of trash toward the wastebasket and missed, Hill removed him from the classroom and put him in the "break room," where he was kept for approximately 20 minutes before he was allowed to leave and get on the bus.

143. On or about January 31, 2023, E.S. was in the classroom tapping his pencil when Hill told him to stop, then removed him from class and once again took him to the "break room." When E.S. asked Hill when he could go back to class, Hill told him that he needed to "process" why he was upset. Hill made him stay in the "breakroom" for over an hour until dismissal time, when he was let out to get on the bus.

144. Plaintiff conservatively estimates that between February 2022 and February 2023, the Individual Defendants placed E.S. in some form of seclusion approximately 50 times for a total of around 40 hours--probably more.

145. During that time, their own records document a harrowing account of the trauma, fear and anxiety which their abuse instilled in E.S. Aside from being cruel and sadistic, the Individual Defendants' practice—and the District's policy or custom—of seclusion was a flagrant violation of his civil rights, as detailed below.

### IV.    CLAIMS FOR RELIEF

### COUNT I
### DISABILITY DISCRIMINATION
*Against Warsaw Community Schools and North Central Indiana Special Education Cooperative*

146. Plaintiff incorporates by reference her prior allegations as if fully set forth herein.

147. This claim is brought against the District and North Central pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq. ("Section 504") and its implementing regulations, 34 C.F.R. § 104 et seq. and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 and its implementing regulations, 28 C.F.R. Part 35.

148. Each Defendant named in this Count is a "public entity" as defined by 42 U.S.C. § 12131(1).

149. Defendants operate a "program or activity" as defined by 29 U.S.C. § 794(b); namely, provision of educational services.

150. Defendants receive federal financial assistance.

151. E.S. is a "qualified individual with a disability" as defined by 42 U.S.C. § 12131(2).

152. By reason of his disability, Defendants intentionally excluded E.S. from participation in or denied him the benefits of the services, programs or activities of a public entity or intentionally subjected E.S. to discrimination.

153. Section 504 guarantees E.S. the right to participate, along with nondisabled students, in nonacademic and extracurricular activities (e.g., lunch, recess, recreational activities) and services to the maximum extent appropriate to his needs. 34 C.F.R. § 104.34(a), (b).

154. E.S.'s medical condition substantially limits one or more major life activities. He is an "individual with a disability" as defined by 29 U.S.C. § 705.

155. Defendants discriminated against E.S. by reason of his disability in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 et seq. Specifically, Defendants deprived him of the opportunity to attend school and participate in their programs or activities to the same extent as his nondisabled peers and subjected him to a hostile educational environment.

156. E.S.'s right to attend public school and participate in its programs or activities free from discrimination on the basis of his disability is a clearly established statutory right of which reasonable school employees would have been aware.

157. Defendants knowingly and intentionally excluded E.S. from participation in, denied him the benefits of, or otherwise subjected him to discrimination under a program or activity which receives federal financial assistance in violation of 34 C.F.R. § 104(a).

158. By denying E.S. equal access to educational programs or activities by numerous acts of restraint, seclusion, isolation, denial of participation and creating a hostile educational environment, Defendants discriminated against him because of his disability. Non-disabled persons receive the benefits or services for which E.S. is otherwise qualified, but E.S., solely by reason of his disability, was excluded from, denied participation in or denied the benefits of attending school by Defendants or was otherwise subjected to discrimination by Defendants.

## COUNT II

## EQUAL PROTECTION

### *Against Ferber, Rees, Trimble, Whitlock, Hill, Marshall, Wolpert, Holland and Roberts*

159. Plaintiff incorporates by reference her previous allegations as if fully set forth herein.

160. This claim is brought against Ferber, Rees, Trimble, Whitlock, Hill, Marshall, Wolpert, Holland and Roberts pursuant to 42 U.S.C. §1983.

161. Under federal law and the U.S. Constitution, E.S. has the right to attend public school free from discrimination because of his membership in a particular class. This is a clearly established right of which reasonable school employees would be aware.

162. Defendants intentionally or with deliberate indifference to E.S.'s rights deprived him of one or more rights secured by the Constitution or federal law.

163. Defendants were motivated by a discriminatory purpose because of his membership in a definable class; namely, his disability, and subjected E.S. to multiple instances of discrimination (primarily in the form of seclusion) because of his disability.

164. Nondisabled students were not subjected to the same treatment as E.S. The Individual Defendants did not treat students without disabilities the same way they treated E.S. and the District and North Central's custom or practice of secluding students does not apply to students without disabilities.

165. Defendants, acting under color of law, deprived E.S. of equal protection under the law and discriminated against him because of his disability in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution.

## COUNT III

## UNREASONABLE SEIZURE

*Against Ferber, Rees, Trimble, Whitlock, Hill, Marshall, Wolpert, Holland and Roberts*

166. Plaintiff incorporates by reference her previous allegations as if fully set forth herein.

167. This claim is brought against Ferber, Rees, Trimble, Whitlock, Hill, Marshall, Wolpert, Holland and Roberts pursuant to 42 U.S.C. §1983.

168. The Fourth Amendment to the U.S. Constitution guarantees E.S. the right to attend public school without being subjected to unreasonable seizures of his person. This is a clearly established right of which a reasonable school employee would be aware.

169. When placed in seclusion by District employees, a reasonable student would not believe that he was free to leave. Therefore, Defendants' seclusions of E.S. as described herein constitute a seizure of his person.

170. Defendants did not have probable cause or reasonable suspicion to believe that E.S. was in imminent danger of injuring himself or others, yet they placed him in seclusion or kept him there when doing so was not reasonably necessary to prevent physical harm. As such, their seizures of his person were unreasonable under the circumstances then existing and apparent.

171. Defendants' actions deprived E.S. of his right to be free from unreasonable seizure.

172. As a direct and proximate result of being unreasonably and repeatedly seized, E.S. sustained damages.

44

## COUNT IV

### SUBSTANTIVE DUE PROCESS

*Against Ferber, Rees, Trimble, Whitlock, Hill, Marshall, Wolpert, Holland and Roberts*

173.  Plaintiff incorporates by reference her previous allegations as if fully set forth herein.

174.  This claim is brought against Ferber, Rees, Trimble, Whitlock, Hill, Marshall, Wolpert, Holland and Roberts pursuant to 42 U.S.C. §1983.

175.  E.S. has a fundamental liberty interest in his freedom of movement, bodily integrity and human dignity which is protected by the Fourteenth Amendment to the United States Constitution. This includes the right to be free of unreasonable confinement, social isolation, physical discomfort, fear, humiliation and physical restraint. These are clearly established rights of which a reasonable school employee would be aware.

176.  The actions of Defendants deprived E.S. of his fundamental liberty interest in freedom of movement, bodily integrity and human dignity.

## COUNT V

### MUNICIPAL LIABILITY

*Against Warsaw Community Schools and North Central Indiana Special Education Cooperative*

177. Plaintiff incorporates her previous allegations as if fully set forth herein.

178. This claim is brought against the District and North Central pursuant to 42 U.S.C. § 1983.

179. At all times relevant, Defendants had a practice of placing students with disabilities in seclusion with deliberate indifference to their constitutional rights. This practice was so

45

widespread and well-settled as to constitute a policy or custom of Defendants which is unconstitutional.

180. E.S. was deprived of his clearly established constitutional rights as a result of Defendants' policy or custom of placing students with disabilities in seclusion.


## COUNT VI

### SUPERVISOR LIABILITY

#### *Against Ferber, Rees and Hobbs*

181. Plaintiff incorporates by reference her previous allegations as if fully set forth herein.

182. This claim is brought against Ferber, Rees and Hobbs.

183. The actions of Trimble, Whitlock, Hill, Marshall, Wolpert, Holland and Roberts deprived E.S. of his clearly established constitutional rights.

184. Trimble, Whitlock, Hill, Marshall, Wolpert, Holland and Roberts acted at the direction of Ferber, Rees or Hobbs or with their knowledge or consent. Ferber and Rees were also personally involved in one or more instances of unlawfully secluding E.S.

185. Ferber, Rees and Hobbs directed, condoned or acquiesced in Trimble, Whitlock, Hill, Marshall, Wolpert, Holland and Roberts' seclusion of E.S. even when doing so was excessive or unnecessary.

## **RELIEF REQUESTED**

Plaintiff requests the following relief:

1. Judgment in her favor and against Defendants;

2. Compensatory damages;

3. Punitive damages;

4. Reasonable attorney fees;

5. Pre- and post-judgment interest;

6. Costs; and

7. All other relief reasonable in the premises.

Respectfully submitted,

/S/Thomas W. Blessing
Thomas W. Blessing (#15696-49)
MASSILLAMANY JETER & CARSON, LLP
11650 Lantern Road, Suite 204
Fishers, IN 46038
Telephone: (317) 576-8580
Facsimile: (317) 203-1012
E-mail:  tom@mjcattorneys.com

*Attorney for Plaintiff*